# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY ELLER,<br><br>      Plaintiff,<br><br> v.<br><br>AUTOMATIC DATA PROCESSING, INC.,<br><br>      Defendant. | Case No. 23-cv-0943-BAS-AHG<br><br>**ORDER GRANTING PLAINTIFF'S** ***EX PARTE*** **APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

Before the Court is Plaintiff's *Ex Parte* Application for Temporary Restraining Order. (TRO App., ECF No. 3.) Defendant opposes. (Opp., ECF No. 9.) The Court held oral argument on June 2, 2023. (ECF No. 17.) Having considered the parties' filings and oral argument, the Court **GRANTS** Plaintiff's *Ex Parte* Application for Temporary Restraining Order. (ECF No. 3.)

**I. BACKGROUND**

Defendant Automatic Data Processing, Inc. ("Defendant" or "ADP") employed Plaintiff Amy Eller ("Plaintiff") from approximately November 2018 until January 2023, when it terminated her. (Compl. ¶ 13.) Plaintiff was employed as a sales representative, and her job duties included calling existing and prospective small business customers to sell ADP services and products. (*Id.*)

Plaintiff signed a total of six relevant contracts ("Agreements") during the course of her ADP employment. In 2018, Plaintiff signed a Sales Representative Agreement

("SRA"), which contained non-solicitation, non-disclosure, non-use, and non-hire provisions. (*Id.* ¶ 14.) The parties dispute whether Plaintiff signed a Non-Disclosure Agreement ("NDA") in 2018. (Eller Decl. ¶ 11, ECF No. 3-1.) The NDA contained similar covenants to the SRA but also included a "Governing Law" provision, which stipulated that New Jersey law would apply to, and New Jersey courts would have jurisdiction over, any disputes related to the NDA. (Compl. ¶ 15.) Then, between 2020 and 2022, Plaintiff signed four Restrictive Covenant Agreements. (*Id.* ¶ 16.) The Restrictive Covenant Agreements are substantially similar to each other. They include the non-solicitation, non-disclosure, non-use, and non-hire provisions contained in the SRA and NDA, as well as a "Choice of Law, Venue, and Jurisdiction" provision. (*Id.*) In addition, the Restrictive Covenant Agreements include a non-compete clause, restricting employees from working for an ADP competitor for one year after ADP termination, and a jury waiver clause, waiving Plaintiff's right to a jury trial. (*Id.*)

The Restrictive Covenant Agreements are distinct from the SRA and NDA in the method of agreement. High performing ADP employees are offered a stock award option. (Donohue Decl., Ex. A to Opp., ECF No. 9-1) In order to accept the stock option, employees are required to agree to a Restrictive Covenant Agreement, but acceptance of the stock option is not mandatory. (*Id.*) The stock is awarded through a Fidelity Investments website and the user is required to click "Begin Acceptance." (*Id.* ¶ 8.) The user is first provided a link to the "Grant Agreement" which includes the Restrictive Covenant Agreement. Then the user is required to check a box that states "I have read and agree to the terms of the Award Agreement and Restrictive Covenant Agreement." (*Id.* ¶ 9.) At that point, the user has three options: "Accept Your Grant," "Decline Grant," or cancel. (*Id.* ¶ 10.) Plaintiff accepted the stock award grant and the Restrictive Covenant Agreements four times during her ADP employment. (Opp. 11.)

ADP terminated Plaintiff's employment on January 25, 2023. (Compl. ¶ 13.) In February 2023, Plaintiff began working for an ADP competitor, Heartland Payment Systems, LLC ("Heartland"), in a similar sales representative role. (*Id.* ¶ 27.) On February

8, 2023, ADP's counsel sent Plaintiff a letter referencing the "post-employment obligations" in the Agreements and stating that ADP would "continue to monitor this situation to ensure that you comply with your obligations." (*Id.*)

Plaintiff intends "to sell products and services competitive with ADP's products and services, including, for example, payroll services, to Plaintiff's ADP customers, business partners, and referral sources with whom or which she previously dealt or was familiar with while employed by ADP." (*Id.* ¶ 28.) But Plaintiff alleges she has lost or deferred commissions and other income because she is subject to the covenants contained in the Agreements. (*Id.* ¶ 31.) Plaintiff also states she is fearful of "being haled into court in New Jersey, sued for damages, and barred from performing her job duties for [her new employer]." (*Id.*) ADP has a history of suing former California employees in New Jersey and enforcing similar restrictive covenants against them. (*Id.* ¶ 32.)

Plaintiff seeks declaratory relief to release her from the restrictions of the Agreements. She alleges that the Agreements violate Section 16600 of the California Business and Professions Code.

## II.   LEGAL STANDARD

Rule 65(b) governs the issuance of a temporary restraining order ("TRO"). The standard for a TRO is identical to the standard for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). To obtain either a TRO or a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, the Ninth Circuit "has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (cleaned up). Generally, a TRO is

- 3 -

23cv0943

considered to be "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The moving party has the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

### III. ANALYSIS

Plaintiff argues that she is likely to succeed on the merits, she is likely to suffer irreparable harm in the absence of a TRO, the balance of the equities tips in her direction, and a TRO is in the public interest. Defendant makes three arguments in its Opposition. First, this Court lacks subject matter jurisdiction because this case is not ripe. Second, Plaintiff fails to establish a likelihood of success on the merits because the forum-selection and choice-of-law contract provisions are enforceable—forcing this Court to dismiss or transfer the case and defeating Plaintiff's argument that California law voids the Agreements. And third, Plaintiff fails to establish irreparable harm in the absence of a TRO.

### A. Ripeness

A court cannot exercise subject matter jurisdiction over a claim unless it presents an adequate case or controversy under Article III of the United States Constitution. *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). To present a justiciable case or controversy, a claim must be ripe for review. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). "[T]he appropriate standard for determining ripeness of private party contract disputes is the traditional ripeness standard, namely, whether 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 671 (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

The Declaratory Judgment Act poses a challenge for courts analyzing ripeness. "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Cas. Co.*, 312 U.S. at 273. Courts in the Ninth Circuit, however,

have coalesced around two guiding principles for declaratory relief sought between privately contracting parties.

First, if the plaintiff—the would-be breaching party—has not yet breached the contract, there is not "sufficient immediacy and reality" to create a case or controversy. *See Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1087 (9th Cir. 2015) ("[D]eclaratory-judgment suits raise ripeness concerns—in a typical context—when conduct that allegedly violates a contractual provision has not yet been undertaken or when any injury from actual or potential breaches has yet to materialize."); *see also Wood v. NewBridge Res. Grp., LLC*, No. 220-cv-10865-VAP-AGRx, 2021 WL 4803494, at *4 (C.D. Cal. Mar. 11, 2021); *Kim v. Tesoro Ref. & Mktg. Co. LLC*, No. 217CV06241ABRAOX, 2017 WL 11680958, at *2 (C.D. Cal. Dec. 13, 2017); *Kordich v. Salton, Inc.*, No. 05CV0202-LAB (RBB), 2005 WL 8173161, at *4 (S.D. Cal. July 5, 2005). In essence, if the plaintiff has not yet breached, then there are two layers of attenuation: the potential breach and the potential lawsuit. Courts find no case or controversy in these cases. Here, based on the limited information before the Court, it appears Plaintiff breached at least some aspects of her employment agreements. Plaintiff has accepted employment with a competitor of ADP in potential violation of the non-compete clause in the Restrictive Covenant Agreements. In addition, Plaintiff "recently negotiated a potential transaction for Heartland payroll services with an ADP referral source with whom she worked while employed by ADP but could not complete the transaction (and has not earned her commissions on the deal) . . . ." (Compl. ¶ 31.) This conduct potentially violates the non-use clauses of the Restrictive Covenant Agreements, regardless of whether Plaintiff completed the transaction. Thus, Plaintiff has demonstrated that she potentially breached her contracts, distinguishing this case from those found non-justiciable.

Second, when the defendant has sworn to the court that it has no intention of enforcing the contract at issue, courts have found claims for declaratory judgment unripe. *See Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017, 1028 (C.D. Cal. 2012);

*Baerg v. KollegeTown*, No. SACV190929DOCFFM, 2019 WL 4570038, at *2 (C.D. Cal. July 23, 2019). Here, Defendant states, "ADP has not taken any action to enforce the non-competition provisions in the [Restrictive Covenant Agreement] . . . . If ADP decides to enforce restrictive covenants, it files a lawsuit. ADP has not filed a lawsuit." (Opp. 15.) But nothing in Defendant's briefing or oral argument represents that it has no intention of enforcing the contracts at issue. (Opp.; ECF No. 17.) Thus, this case is distinguishable from the cases cited in Defendant's Opposition. Plaintiff has materially breached the contracts at issue, and Defendant has made no representation that it does not intend to enforce those contracts.

By contrast, when a defendant sends a letter that insinuates or explicitly threatens litigation, courts find a request for declaratory judgment ripe. If a defendant's actions "cause the plaintiff to have a 'real and reasonable apprehension that he will be subject to liability,' the plaintiff has presented a justiciable case or controversy." *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir. 1992) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989)). In *Spokane Indian Tribe*, the plaintiff-tribe received a letter from the United States Attorney's Office stating that the tribe's "Pick Six" was a Class II gaming device and its operation violated state and federal law. *Id.* The letter further instructed the tribe to "discontinue operation of 'Pick Six' lotto as soon as is practicable." *Id.* As a result of the letter, the Ninth Circuit found that the tribe has "reasonable apprehension that it would be subject to litigation and loss of its property if it continued to operate the Pick Six games." *Id.*; *see also AMRESCO Com. Fin., LLC v. T.P. Sampson Co.*, No. CV 05-41-S-LMB, 2005 WL 1863282, at *8 (D. Idaho Aug. 4, 2005) (finding a justiciable case and controversy after defendants sent a demand letter to plaintiff).

Similarly, here, after Defendant terminated her employment, Plaintiff received a letter, which could be reasonably construed as a threat of litigation. (Compl. ¶ 15.) The letter referenced her "post-employment obligations" contained in the Agreements and stated that ADP would "continue to monitor this situation to ensure that you comply with

your obligations." (Ex. G to TRO App., ECF No. 3-1.) Moreover, Plaintiff cites to several examples of Defendant suing former employees to enforce the same contracts at issue here. Thus, based on Plaintiff's conduct and Defendant's actions, Plaintiff has a "real and reasonable apprehension" of liability. *See Spokane Indian Tribe*, 972 F.2d at 1092. The Court finds this case ripe.

### B. Likelihood of Success on the Merits

Plaintiff argues that Section 16600 of the California Business & Professions Code ("Section 16600") voids the non-compete agreements, non-solicitation agreements, de facto non-compete confidentiality restrictions, and jury trial waivers in the Agreements. Defendant does not argue that the Agreements are enforceable under California law. Rather, Defendant argues Plaintiff fails to establish a likelihood of success on the merits for two reasons. First, the case is likely to be transferred or dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(3). Second, New Jersey, not California, substantive law applies to the Agreements.

#### 1. Transfer or Dismissal under Rule 12(b)(3)

Defendant argues Plaintiff cannot establish a likelihood of success on the merits because the case is likely to be dismissed or transferred for improper venue pursuant to Rule 12(b)(3). (Opp. 17.) Defendant, however, asserts the wrong procedure for enforcing a forum selection clause. Defendant cites *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996), to support the proposition that dismissal under Rule 12(b)(3) is proper when a valid forum selection clause designates another court as the exclusive venue for litigation. (Opp. 17.) The Supreme Court, however, has more recently determined that a court may not enforce a forum selection clause under Rule 12(b)(3). *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 52 (2013). Rather, courts may enforce a forum selection clause only under 28 U.S.C. § 1404(a), which allows courts discretion to transfer cases for convenience and in the interests of justice. *Id.* Therefore, even if the forum-selection clause is valid, venue is still proper and the Court has jurisdiction to rule on the TRO. *See Humana Ins. Co. v. Tenet Health Sys.*, No. 1:16-CV-1450 AWI SAB,

2016 WL 6094676, at *7 (E.D. Cal. Oct. 17, 2016) (extending a TRO before transferring the action under 28 U.S.C. § 1404(a) due to a valid forum selection clause).

### 2. Substantive Law and Forum

Defendants also argue that Plaintiff is not likely to succeed on the merits because California substantive law does not apply to the Agreements.[1] The Court finds a likelihood that (1) California Labor Code § 925 ("Section 925") makes voidable the choice of law provisions in the Agreements and (2) even if Section 925 did not apply, California law applies under the choice of law default rules.

#### a) California Labor Code Section 925

The California Legislature has made voidable certain employment-related forum selection clauses. Specifically, California Labor Code Section 925(a) ("Section 925") provides, in relevant part:

> An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:
> (1) Require the employee to adjudicate outside of California a claim arising in California.
> (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

Cal. Lab. Code § 925(a). If Section 925 applies to the contracts in this case, then the forum selection and choice of law clauses are voidable. This hinges on whether the contracts were "a condition of employment." *Id.*

Plaintiff signed five relevant contracts during her employment with Defendant: a Sales Representative Agreement ("SRA") and four Restrictive Covenant Agreements. (Compl. ¶ 14–17.) The SRA did not contain a choice of law clause, but the Restrictive

---

[1] The Agreements designate New Jersey as the exclusive source of substantive law and New Jersey courts as the exclusive venue for litigating employment disputes between the parties. The enforceability of the forum selection clause likely dictates whether this Court will transfer the action to a New Jersey court; the enforceability of the choice of law clause likely dictates whether Plaintiff's substantive claims are likely to succeed on the merits. The Court only addresses the choice of law clause because, as discussed above, the Court has jurisdiction to decide the TRO, even if a valid forum selection clause exists.

Covenant Agreements did. (Exs. A–F to Compl.) Plaintiff asserts that all five contracts were signed as a condition of her employment with Defendant. Defendant argues that the four Restrictive Covenant Agreements were not a condition of employment, but rather a condition of receiving a stock bonus. (Opp. 13–14.) High performing ADP employees are offered a stock award option. (Donohue Decl. ¶ 4.) In order to accept the stock option, employees are required to agree to a Restrictive Covenant Agreement, but acceptance of the stock option is not mandatory. (*Id.*) Defendant's Opposition asserts Plaintiff's decision to sign the Restrictive Covenant Agreements would have had no impact on her continued employment at ADP. (Opp. 19.)

In interpreting whether Section 925 applies to a particular contract, the plain language can be dispositive. *See Lyon v. Neustar, Inc.*, No. 219-cv-00371-KJM-KJN, 2019 WL 1978802, at *7 (E.D. Cal. May 3, 2019) ("[O]ne need look no further than the preamble of the employment agreement to see that the forum-selection clause was both a requirement and a condition of [plaintiff's] employment with [defendant]."). The plain language of the Restrictive Covenant Agreements indicates that signing the agreement is a condition of employment. The Restrictive Covenant Agreement reads in relevant part:

> NOW, THEREFORE, **in consideration of my continuing employment**, my participation in the 2018 Omnibus Award Plan and the receipt by me of valuable stock in ADP, ADP's disclosure to me of proprietary information, Confidential Information, and trade secrets to allow me to perform my duties for ADP, the mutual benefits conferred herein, and for other good and valuable consideration (the receipt and sufficiency of all of which I hereby acknowledge), I agree as follows: . . . To the extent permitted by the law of the state in which I reside, the interpretation, validity, and enforcement of this Agreement will be governed by the laws of the State of New Jersey, without regard to any conflicts of law principles. I agree that to the extent permitted by the law of the state in which I reside, any action by me to challenge the enforceability of this Agreement must be brought it litigated exclusively in the appropriate state or federal court located in the State of New Jersey.

(ECF No. 1-2 at 35, 41 (emphasis added).) Nothing in the language on the Fidelity website or the Restrictive Covenant Agreements themselves makes clear that continued

employment is not contingent on signing the Restrictive Covenant Agreements. (Donohue Decl. ¶ 12; Ex. C to Compl., ECF No. 1-2.) Moreover, the Restrictive Covenant Agreements were explicitly conditioned on "ADP's disclosure to me of proprietary information, Confidential Information, and trade secrets to allow me to perform my duties for ADP." (ECF No. 1-2 at 35.) In other words, the contract states Plaintiff will not have access to information necessary to perform her duties if she does not agree to the restrictive covenants.

Defendant submits that Plaintiff's employment would not have been affected by her refusal to sign the Restrictive Covenant Agreements. But Plaintiff attests that she understood the Restrictive Covenant Agreements to be a condition of her continued employment: "ADP presented the Agreements to me on a take-it-or-leave-it basis, and I understood that I would not have been allowed to continue working at ADP or receiving my compensation unless I signed/accepted the Agreements." (Eller Decl. ¶ 8.)

Furthermore, several courts have found that Section 925 applies when a choice of law agreement is conditioned on part of an employee's compensation. *See Rockefeller Capital Mgmt., LLC v. Focus Fin. Partners, LLC*, No. CGC-18-568832, 2018 WL 11540958, at *1–2 (Cal. Super. Ct. Oct. 31, 2018) ("[T]he phrase 'condition of employment' . . . [includes] any requirement to receive employment compensation"); *cf. Jurek v. Piller USA, Inc.*, No. 21-CV-150 W (KSC), 2021 WL 2937050, *2–3 (S.D. Cal. July 13, 2021) (finding Section 925 applies to a Sales Incentive Plan agreement that was incorporated into an initial employment agreement). The Court finds the reasoning of the *Rockefeller* court persuasive. Compensation, including bonuses and stock awards, are fundamental conditions of employment. The stock awards that Plaintiff earned through her high performance were part of her compensation. Thus, the Court finds that the Restrictive Covenant Agreements were a condition of Plaintiff's employment.

In opposition, Defendant cites two district court cases that declined to apply Section 925 to employment contracts. But these cases are distinguishable. In both cases, the contracts at issue had an explicit opt-out provision for the choice of law agreement. In

*Romero v. Watkins & Shepard Trucking, Inc.*, the contract included "a provision allowing Plaintiff to opt-out within thirty days." No. EDCV 19-2158 PSG (KKx), 2020 WL 5775180, *3 (C.D. Cal. July 10, 2020). In *Cordero v. C.R. England, Inc.*, the contract stated that the forum selection clause was "optional and not a condition of employment." Employees had "the right to reject it without affecting [the employee's] eligibility for employment with [the employer]" by communicating "at any time within 14 days after signing this Contract." No. EDCV 20-2675 JGB (KKx), 2021 WL 2793929, *2 (C.D. Cal. Apr. 30, 2021). Here, the Restrictive Covenant Agreements had no such provision.

In sum, Plaintiff has demonstrated a likelihood that Section 925 applies to the Agreements. As a result, the choice of law clauses are likely voidable.

### b) Choice of Law Default Rules

Even if Section 925 does not apply to the Agreements in this case, the default choice of law rules likely compel the Court to apply California law. Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations. *See Fields v. Legacy Health Sys.*, 413 F. 3d 943, 950 (9th Cir. 2005) (internal citation omitted). "In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflect a strong policy favoring enforcement of such provisions." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464–65 (1992). Under the Second Restatement, courts must analyze:

> [W]hether the chosen state has a substantial relationship to the parties or their transaction, or whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a materially greater interest than the chosen state in the determination of the particular issue.

*Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 (2001).

Courts have found a fundamental conflict between California and other states on the enforceability of various restrictive employment covenants. *See Stryker Sales Corp. v. Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606, 621 (E.D. Cal. 2017) ("[T]here appears to be a trend among California courts of finding that § 16600 represents a fundamental public policy interest in California and that it should override contractual choice-of-law provisions at least with respect to such restrictive covenants.") (collecting cases); *see also Philo v. Giftango LLC*, No. 13CV0094 JM(BLM), 2013 WL 12097545, at *3 (S.D. Cal. Feb. 7, 2013).

Thus, it is likely that California law applies to the Restrictive Covenant Agreements, even if Section 925 does not. For the reasons stated in Plaintiff's briefing, which are not substantively challenged by Defendant's Opposition, the non-compete, non-solicitation, non-recruitment, non-hire, and confidentiality restrictions are likely void under California law. Therefore, Plaintiff has demonstrated a likelihood of success on the merits.

### C. Irreparable Harm

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (citing *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)). In this case, the issue is a close one, but the Court finds Plaintiff has demonstrated irreparable harm.

Plaintiff argues that the Restrictive Covenant Agreements have caused her to lose commissions in her new position and impeded her ability to earn a living in her chosen profession.[2] Further, she argues her underperformance continues to damage her professional reputation and goodwill. (TRO App. 30.) Defendant counters that monetary

---

[2] Plaintiff cites several California state court decisions with similar fact patterns. This Court, however, must apply the federal "irreparable harm" standard, which materially deviates from California's "interim harm" standard. *See Hilb, Rogal & Hamilton Ins. Servs. v. Robb*, 33 Cal. App. 4th 1812, 1822 (1995) ("In evaluating interim harm, the trial court compares the injury to the plaintiff in the absence of an injunction to the injury the defendant is likely to suffer if an injunction is issued.").

damages would be sufficient to redress any injuries and that her delay in filing her TRO Application demonstrates a lack of irreparable harm. (Opp. 21–22.)

"Mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." *Goldie's Bookstore v. Superior Ct. of the State of Cal.*, 739 F.2d 466, 471 (9th Cir. 1984). But certain types of monetary damages become irreparable, particularly when a plaintiff is unable to work. Where the likely harm causes "lost wages and the ability to meet [plaintiff's] family's needs," there may be irreparable harm. *See Philo v. Giftango LLC*, No. 13cv0094 JM(BLM), 2013 WL 12097545, at *6 (S.D. Cal. Feb. 7, 2013).

In this case, Plaintiff attests, "The Agreements and ADP's Letter threaten my livelihood and ability to meet my family's needs. As a result of the Agreements, I cannot fully carry out my job duties at Heartland, and I have already lost or deferred commissions and other income." (Eller Decl. ¶ 14.) Plaintiff has identified potential clients through cold calling, but then turned down business meetings with them because she later learned of their connections to ADP. (*Id.*) Furthermore, in the absence of a TRO, Plaintiff will likely be forced to "spend a substantial amount money and time away from home in California to defend against its claims, and prevent me from performing further work for my new employer." (*Id.* ¶ 10.) Thus, both the fear of potential litigation and the actual process of litigation threaten Plaintiff's position with her new employer.

Moreover, reputational harm may be considered irreparable. *See Lyden v. Adidas Am., Inc.*, No. 3:14-CV-01586-MO, 2015 WL 758642, at *4 (D. Or. Feb. 20, 2015). Although the law is well established when an employer sues an employee to enforce a non-compete, there are few examples of the facts presented here. *See e.g.*, *Amazon.com, Inc. v. Moyer*, 417 F. Supp. 3d 1388, 1403 (W.D. Wash. 2019) ("The Court agrees with Amazon's argument that the type of damages caused by violation of noncompete provisions are often irreparable."). Some courts in other jurisdictions have found irreparable harm when an employee seeks to enjoin a former employer from enforcing restrictive covenants. *See MacGinnitie v. Hobbs Group, LLC,* 420 F.3d 1234, 1242 (11th Cir. 2005) ("Because of

this public policy [against non-compete agreements], the Georgia courts and this court have not hesitated to find irreparable harm in cases involving covenants not to compete."); *Stein v. Lee Eye Ctr., Inc.*, No. 221CV01730CCWLPL, 2021 WL 5770212, at *3 (W.D. Pa. Dec. 6, 2021) (finding that a doctor-plaintiff seeking declaratory relief invalidating a non-compete agreement will suffer immediate irreparable harm based on "loss to his reputation, patient good will, and standing in the community").

Plaintiff attests that her underperformance due to the Restrictive Covenant Agreements is "damaging [her] reputation, credibility, and goodwill, which [she] has built over years of hard work, with former customers, referral sources, prospective customers, and other sources." (Eller Decl. ¶ 14.) The Court finds such reputational damage is likely irreparable for a sales representative, who relies on relationships and networks.

Finally, the Court addresses Defendant's argument regarding delay. A delay in a plaintiff's filing indicates "a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *see also Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("[T]hat [the moving party] tarried so long before seeking this injunction is . . . relevant in determining whether relief is truly necessary."). Here, three months lapsed between Plaintiff receiving the letter from ADP and filing this lawsuit. ADP cites several cases supporting the proposition that this delay defies irreparable harm. But in each of the cases cited, the delay occurred during litigation, after the plaintiffs had filed their initial complaints. *See Hueso v. Select Portfolio Servicing, Inc.*, No. 18-CV-1892-BAS-WVG, 2019 WL 3459013, at *2, 5 (S.D. Cal. July 31, 2019) (finding a three-month gap between knowledge of the alleged conduct and seeking injunctive relief "counsels against a finding that the requested relief is warranted"); *Dahl v. Swift Distribution, Inc.*, No. CV 10-00551 SJO (RZx), 2010 WL 1458957, at *4 (C.D. Cal. Apr. 1, 2010) (finding that an 18-day delay between filing the complaint and filing a TRO "implies a lack of urgency and irreparable harm.").

In this case, Plaintiff's delay occurred prior to filing her initial Complaint in state court. She then immediately filed her application for TRO. It reasonably takes time for a potential plaintiff to find counsel and collect documents in preparation of filing a complaint. By contrast, in the cases cited, the plaintiffs had counsel and had begun litigation. The difference is significant. The Court, therefore, considers Plaintiff's three-month delay but does not find it dispositive on the issue of irreparable harm.

In sum, the Court finds Plaintiff carries her burden in establishing a likelihood of irreparable harm.

### D. Balance of the Equities and Public Interest

The Court finds the balance of the equities tip in favor of Plaintiff, and that a temporary restraining order is in the public interest.

Defendant represents that it will lose the ability to enforce its covenants, protect its trade secrets, and maintain confidential information. ADP avers, "Enjoining ADP from enforcing the non-disclosure and non-use provisions in the Restrictive Covenant Agreements would inequitably strip ADP of its right to hold Eller accountable for her theft and to prevent any further misuse of ADP's confidential and proprietary information." (Opp. 24.)

To begin, Defendant's argument undermines its own ripeness argument. Defendant's ripeness argument rests on the attenuation of a potential lawsuit; Defendant's balance of the equities argument rests on its need to imminently sue Plaintiff. If Defendant had no intention of suing Plaintiff immediately, then a TRO would have no detriment. The Court's TRO will not impact Defendant's right to sue for compensatory damages if the Court eventually finds the Agreements enforceable. Indeed, the impact of the TRO is merely to preserve the status quo while the parties litigate the issues. The TRO prevents Defendant from restarting litigation in a jurisdiction across the country, based on a forum selection clause that the Court has found likely to be voidable.

Moreover, an injunction serves California's strongly-held public policy protecting employees preserved in its Labor Code and Business and Professions Code. *See Lyon*, 2019

WL 1978802, at *9 ("[A]ny contract provision that runs afoul of section 925 is contrary to California's strong public interest in protecting its employees. On that ground alone, the public policy interests relevant here weigh in support of preliminarily enjoining Neustar's pursuit of arbitration outside of California."). Thus, the final two *Winter* elements favor Plaintiff as well.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's *Ex Parte* Application for Temporary Restraining Order (ECF No. 3). Defendant is enjoined from attempting to enforce the Agreements outside the present action.

**IT IS SO ORDERED.**

**DATED: June 5, 2023**

Hon. Cynthia Bashant
United States District Judge